UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DAVID MCDONALD,                           )
JAMES SCHEURICH,                          )
STEVEN ALAN CARR, and                     )
DAVID G. SCHUSTER,                        )
                                          )
            *Plaintiffs*,                 )
      v.                                  )  Case No. 1:24-cv-01575-RLY-CSW
                                          )
TRUSTEES OF INDIANA UNIVERSITY, in        )
their official capacities, and            )
TRUSTEES OF PURDUE UNIVERSITY,            )
in their official capacities,             )
                                          )
            *Defendants*.                 )
                                          )
_____       )
                                          )
STATE OF INDIANA,                         )
                                          )
            *Intervenor*.                 )


**UNIVERSITY DEFENDANTS' REPLY BRIEF IN SUPPORT OF
THEIR MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION**

John R. Maley
Dylan A. Pittman
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: (317) 231-7464
Email:  jmaley@btlaw.com
        dpittman@btlaw.com

*Counsel for Defendants*
*Trustees of Indiana University, and*
*Trustees of Purdue University*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND EXECUTIVE SUMMARY ....................................................1

II.   Discussion ....................................................................................................................2

      A.    Article III's pertinent framework remains straightforward. ...............................2

      B.    Standing and ripeness remain absent from the challenge to policies............................3

            1.    Policymaking and implementation remain ongoing and non-final, as in *Carr I*................................................................................................3

            2.    The Response shows no concrete, particularized, actual or imminent Article III harm from the challenged policies........................................7

            3.    Claims against University Defendants remain unripe.......................................12

III.  Conclusion..................................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Babbitt v. United Farm Workers Nat. Union,*
  442 U.S. 289 (1979) ........................................................................................................ 3, 8

*Brown v. Kemp,*
  86 F.4th 745 (7th Cir. 2023) ........................................................................................ 3, 8

*Carr v. Trustees of Purdue Univ.,*
  2024 WL 3819424 (S.D. Ind. Aug. 14, 2024) ............................................................passim

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................................................8

*Laird v. Tatum,*
  408 U.S. 1 (1972) ................................................................................................................9

*Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ............................................................................................................12

*Perry v. Arlington Heights,*
  186 F.3d 826 (7th Cir. 1999) .............................................................................................6

*Perry v. Sheahan,*
  222 F.3d 309 (7th Cir. 2000) .............................................................................................6

*Schirmer v. Nagode,*
  621 F.3d 581 (7th Cir. 2010) ...........................................................................................12

*Speech First, Inc. v. Killeen,*
  968 F.3d 628 (7th Cir. 2020) ........................................................................................ 3, 9

*Sweeney v. Raoul,*
  990 F.3d 555 (7th Cir. 2021) ...........................................................................................12

*Tate v. Showboat Marina Casino P'ship,*
  431 F.3d 580 (7th Cir. 2005) .............................................................................................6

*Thole v. U. S. Bank N.A,*
  590 U.S. 538 (2020) ............................................................................................................2

*Triple G Landfills, Inc. v. Fountain Cnty. Bd. of Comm'rs of Fountain Cnty., Ind.,*
  977 F.2d 287 (7th Cir. 1992) ...........................................................................................12

*Trump v. New York,*
   592 U.S. 125 (2020) ................................................................................................ 3, 12

*Whole Woman's Health v. Jackson,*
   595 U.S. 30 (2021) ..................................................................................................... 11

**Statutes**

I.C. § 21-39.5-2-1(b) ..................................................................................................... 1

I.C. § 21-39.5-2-2(a) ..................................................................................................... 1

I.C. § 21-39.5-2-4 .......................................................................................................... 7

**Other Authority**

Federal Rule of Civil Procedure 12(b)(1) .................................................................. 1, 6

## I.    INTRODUCTION AND EXECUTIVE SUMMARY

Despite Plaintiffs' Rule 12(b)(1) Response [ECF44] saying this suit warrants a different outcome than its materially identical predecessor that this Court dismissed for want of Article III ripeness and standing, jurisdiction remains absent.  In the prior case, the same four tenured professors sued the same parties (including the Universities employing Plaintiffs) on the same constitutional challenges to the same laws at issue here, which took effect July 1, 2024, requiring Trustees of public universities to promulgate and implement policies on tenure and promotions.  *Carr v. Trustees of Purdue Univ.*, 2024 WL 3819424, at *1 (S.D. Ind. Aug. 14, 2024) (*Carr I*).  The Court found standing and ripeness lacking, as University Defendants' compliance efforts were "preliminary steps" including "interim policies," and "predictions as to how [Universities] may or may not eventually implement" the Act were "conjecture" "fall[ing] short of … a justiciable Case or Controversy." *Id.* at *6-7.

The Response fails to justify a different result in this case, which Plaintiffs filed weeks after *Carr I* challenging the same statutes—I.C. § 21-39.5-2-1(b)(1)–(2) and I.C. § 21-39.5-2-2(a)(1)–(2) ("Section 1(b)" and "Section 2(a)," respectively)—plus "the policies that the Universit[ies] adopted as directed by these statutes." [*E.g.*, ECF1 at 17-18, ¶¶70-71.]  Plaintiffs do not dispute that policymaking and implementation of the Act at the Universities remain "ongoing," with the challenged policies still preliminary, interim, and subject to change.  [*Compare, e.g.*, ECF43 at 14-15, 18-21 & nn.3-6 (detailing, *e.g.*, Plaintiffs' concessions), *with generally* ECF44 (not contesting the concessions).]  Nor can the Response identify any facts here materially distinguishing those that required dismissal of the non-justiciable, unripe suit in *Carr I*.  Although the Response thus resorts to suggesting that the preliminary, interim status of policymaking and implementation was "dictum" in *Carr I* [ECF44 at 6-7], this is not so.  Such status was emphatically, expressly, and properly critical to *Carr I*'s holding that no standing or ripeness supported the claims against University Defendants.  *E.g.*, *Carr I, 2024 WL 3819424, at *4*.

The Response otherwise remains unable to meaningfully trace any concrete, particularized, actual or imminent Article III harm to what the challenged policies say. Although University Defendants' opening Brief underscored key policy language that Plaintiffs do not and cannot square with their claims of policy-inflicted harm, the Response still has no cogent answer. It instead asserts speculative worries that cannot confer justiciability to challenge the policies, particularly when based on misreadings and misapplications of the policies' text.

Accordingly, this Court should grant University Defendants' motion [ECF42] to dismiss the claims against them for lack of subject-matter jurisdiction.

## II.    Discussion

Apart from challenging two parts of the Act (Sections 1(b) and 2(a)), Plaintiffs challenge "the policies that the Universit[ies] adopted as directed by these statutes." [*E.g.*, ECF1 at 17-18, ¶¶70-71.] But because the challenged policies remain preliminary, interim, and subject to revision amid ongoing implementation efforts, *Carr I*'s bottom line still applies: "[U]nder the circumstances presented here, Plaintiffs have not satisfied the demands of Article III, thereby depriving this court of subject-matter jurisdiction over their claims" against Universities. *Carr I*, 2024 WL 3819424, at *4.[1]

### A.    Article III's pertinent framework remains straightforward.

The Response does not alter key Article III principles that remain dispositive here. Foremost, standing requires Plaintiffs to show (1) "injury in fact that is concrete, particularized, and actual or imminent" (not conjectural or hypothetical); (2) "was caused by the defendant"; and (3) "would likely be redressed by the requested judicial relief." *Thole v. U. S. Bank N.A*, 590 U.S. 538, 540 (2020) (cite

---

[1] Four of the five challenged policies cited in the Response's justiciability section [ECF44 at 1-13] were filed both as Complaint exhibits and preliminary-injunction exhibits: This docket's Complaint exhibits ECF1-1, ECF1-2, and ECF1-4 are Plaintiffs' preliminary-injunction exhibits ECF36-1, ECF36-2, and ECF36-3, respectively; and the pre-consolidation docket's [1:24-cv-1578] Complaint exhibit 1-1 was Plaintiffs' preliminary-injunction exhibit ECF36-6. This Reply will cite to those policies' docket numbers from Plaintiffs' preliminary-injunction exhibits. The Reply will do the same for the fifth challenged policy [ECF36-7] cited by the Response's justiciability section, as it was among Plaintiffs' exhibits only for preliminary-injunction briefing.

omitted).  Ripeness requires that the case stand independent of "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020). In a pre-enforcement challenge like this one, ripeness and standing "plumb the same concept"— "timing"—and apply many of the same precepts. *Carr I*, 2024 WL 3819424, at *4-5  (cites omitted).

For a First-Amendment facial challenge like this one without any prior enforcement action, "[P]laintiffs must make one of two showings to establish an injury in fact." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020).  First, they may aver a *future* injury based on their "'intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and ... a credible threat of prosecution thereunder.'" *Carr I*, 2024 WL 3819424, at *4 (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)); *Killeen*, 968 F.3d at 638-39 ("credible threat" must be "particularized" to Plaintiffs, "affect[ing] the[m] in a personal and individual way" (cite omitted)).  Second, they may demonstrate "a *current* injury if they have resorted to self-censorship out of an 'actual and well-founded fear' that the law will be enforced against them." *Carr I*, 2024 WL 3819424, at *4 (citing *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (quote omitted)).

Although the Response argues that, "to establish that his fear of enforcement is well-founded," "a plaintiff need only show that his 'impacted course of conduct' is 'at least arguably proscribed by the challenged statute' [ECF44 at 9-10 (quoting "*Brown*, 86 F.4th at 764")], the Response's cited authority does not say this, and does not change the Article III framework set forth by University Defendants [*see* ECF43 at 16-18] or the lack of justiciable claims against them.

**B.    Standing and ripeness remain absent from the challenge to policies.**

The Response presents no Article III Case or Controversy against University Defendants.

1.    Policymaking and implementation remain ongoing and non-final, as in *Carr I*.

*Carr I* dismissed for lack of ripeness and standing, as Universities' efforts to comply with the Act were "preliminary steps" including "interim policies," which did "not cast light on what those

policies (and their subsequent implementation) will entail, let alone how the policies may or may not ultimately impact Plaintiffs' First Amendment rights." *Carr I*, 2024 WL 3819424, at *6. "Likewise, Plaintiffs have not addressed whether (or how) the Boards' interim policies arguably enhance their First Amendment concerns or otherwise heighten the threat of harm to them." *Id.*

Yet here, as University Defendants explained and the Response does not deny, the challenged policies are, once again, preliminary and interim measures, with policymaking and implementation still ongoing and subject to change. [*Compare* ECF43 at 14-15, 18-21 & nn.3-6 (so stating, citing, *e.g.*, Plaintiffs' concessions, and noting key overlap among policies challenged here and those that either *Carr I* referenced or were in place as of Plaintiffs' *Carr I* briefing), *with generally* ECF44 (not disputing as much).] For example:

- The Plaintiff from IU Bloomington says that, *e.g.*, since the summer 2024 University-level policy revisions [ECF36-1, -2, -3], work has focused on "what does this really mean," and it remains "ongoing and it even changes depending on what school you are in." [ECF41-8 at 16-17 (Dep., 54:12-58:8); *accord id.* at 16 (55:21-56:8) ("each layer is contingent on the layer before": "first we have to have a campus policy, before we can have a College [of Arts and Sciences] policy, before we can have a department policy, before we can have a faculty member actually implement those policies in their teaching and research," "[s]o it takes a lot of time").]

- The Plaintiff from IU Indianapolis says that, *e.g.*, in January 2025 he and almost all of his fellow members of the Indianapolis Faculty Council voted to enact certain policies related to SEA 202, **none of which are mentioned or challenged** in the Response, that apply to the Indianapolis campus. [ECF41-10 at 26-27, 87 (Scheurich Dep., 24:21-25:11, 85:8-22); *see also id.* at 23, 28 (21:1-3, 26:5-9) (Faculty Council "did a good job" with these Indianapolis-campus changes), *id.* at 93 (91:1-6) (on the meaning of "scholarly," "what's in [SEA] 202 and what's in the university policies is different"—"it's some mediation of the negative possibilities"); *id.* at 32, 34-35, 37 (30:11-24, 32:13-33:13, 35:2- 6) (one of the Indianapolis campus's January enactments "improved" "the definition of intellectual diversity," and addressed faculty concerns about the meaning of intellectual diversity, "stat[ing]" the concept "in language that [faculty] can understand").] Even so, he recognizes that "changes take some time" and "the process of implementing is still ongoing." [*Id.* at 42 (40:3-16).] For instance, he is not aware of anything in the campus's January enactments that addresses certain SEA 202 "post-tenure review" requirements [*id.*], nor has his school enacted "a specific [SEA] 202 policy" [*id.* at 47 (45:7-14)].

- The Plaintiffs from Purdue Fort Wayne report that implementation is "ongoing," with "interim" University-wide measures "subject to revision." [ECF41-9 at 50-51 (Carr Dep., 48:10-49:18) ("implementation of SEA 202 at Purdue," as well as "policymaking … and

development of guidance," are "ongoing"; measures have been "interim" and "subject to revision"; his department has not "enacted or formalized any policies or procedures concerning 202"); *accord id.* at 48 (46:2-20) (policymaking "is still in process"); ECF41-7 at 83 (Schuster Dep., 81:12-20) ("at Purdue, SEA 202 implementation is an ongoing process," with "Purdue ha[ving] issued interim measures" that are "subject to revision"), *id.* at 29-31 (27:25-29:15) ("people at [his] university … are in charge of" the Act's implementation and "put[ting] into action how this is going to all come together," but "[i]t's not entirely clear, and it's kind of a work in progress"; "things will probably become more clear as … administrators start to align their messages with departments and faculty," which is "generally what happens with things like this").][2]

Indeed, the Response neither refutes nor "disagree[s] that these [University] actions are underway," including "the many efforts … underway at the campus, school, and department levels to clarify and "implement … the university-wide policies in ways specific to those entities." [ECF44 at 5-7 (cleaned up) (acknowledging also that *Carr I* referenced key challenged policies as "interim or preliminary").] Nor does the Response address, let alone challenge, any developments in any such downstream, localized efforts. [*See generally id.*]

Rather than denying that the challenged measures remain preliminary or interim, the Response seems to dispute that such status could or should have mattered in *Carr I*, calling it "dictum" that "could not have affected the outcome" there and "does not impact the outcome here." [ECF44 at 6-7 & n.3 (arguing, conclusorily and despite *Carr I*'s express rationale, that "the possible emergence of *more* policies says nothing of the active policies that currently exist" and have allegedly caused harm since before this academic year).] What mattered to *Carr I*'s dismissal, the Response suggests, was that "the claims were not justiciable on the day they were filed" in violation of the principle that "[s]tanding

---

[2] *See also id.* at 28-29 (26:2-27:18) (Board has entrusted the Act's implementation to his campus's vice chancellor of academic affairs, who "is trying to figure out how to" do so; this implementation work is "trickling down" in that "it's gone to our college," which "is trying to figure out what to do," "[a]nd we … had … a department meeting about how it would … ultimately materialize" and be "put into action," including as to "reviews and evaluations"); *id.* at 62-65 (60:22-63:4) (the meeting's "result[]" was that the department" would "continue discussing things with other departments and the college to see if we can settle upon something," such that "we will revisit this in the future when it seems like … there's more maybe top-down direction"; "who knows what will happen," but "each department is coming up with their own way of doing things"; "[s]o there's still just plenty that [Plaintiff Schuster is] figuring out, trying to see how it's ultimately going to work and what makes sense"); *id.* at 82 (80:18-24) (he has "no concerns that [his] department chair will violate Purdue's commitment to freedom of expression in conducting th[e] review process").

must exist at the time a complaint is filed and must be maintained throughout the pendency of the lawsuit." [*Id.* at 6-7 (citing *Perry v. Arlington Heights*, 186 F.3d 826, 830 (7th Cir. 1999)); *id.* (citing *Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 582 (7th Cir. 2005), which favorably noted, "[A] court's stated and, on its view, necessary basis for deciding does not become dictum because a critic would have decided on another basis" (cite omitted)); *see also id.* at 6 n.3 (suggesting unavailingly that perhaps "interim" status makes no legal or factual difference, despite *Carr I*'s contrary reasoning and other unrefuted evidence including Plaintiffs' admissions cited by ECF43 at 14-15, 18-21 nn.3-6).]

This is a non-starter. *Carr I* repeatedly emphasized the preliminary, interim status of University policies and implementation, a fact that expressly and correctly drove its dismissal under Rule 12(b)(1), and aligns with the Response's recognition that a case must be justiciable at every stage [ECF44 at 6-7]. *E.g.*, 2024 WL 3819424, at *5-7 ("the **critical** element of determining the 'nature and extent' of SEA 202's application reposes in the Boards' final policy promulgations, implementation, and enforcement," yet, while University Defendants "have apparently undertaken preliminary steps to" "comply with [the Act's] directives" and "have started their efforts to create such policies in order to comply with the statutory directives," this "does not cast light on what those policies (and their subsequent implementation) will entail, let alone how the policies may or may not ultimately impact Plaintiffs' First Amendment rights"; nor have "Plaintiffs … addressed whether (or how) the Boards' interim policies arguably enhance their First Amendment concerns or otherwise heighten the threat of harm to them" (emph. added; cleaned up)).[3]

Such preliminary status of University policymaking, implementation, and enforcement was plainly critical to *Carr I*'s unappealed, binding dismissal. *See Perry v. Sheahan*, 222 F.3d 309, 318 (7th

---

[3] *See also Carr I*, 2024 WL 3819424, at *5-7 ("[a]bsent the formulation and enforcement of these final policies, it is impossible to determine whether Plaintiffs do in fact have an "objectively good reason for refraining from speaking and self-censoring instead"; "[a]pplying Article III's justiciability principles, we conclude that the text of SEA 202 and the (limited) clarity regarding the Boards' final policy formulations and implementation, taken together, do not support a finding of standing or ripeness regarding Plaintiffs' claims").

Cir. 2000) ("The determination that Perry lacked standing in *Perry I* precludes relitigation of the same standing argument in *Perry II*."). It remains dispositive of the claims against Universities here.

> 2. <u>The Response shows no concrete, particularized, actual or imminent Article III harm from the challenged policies.</u>

As University Defendants noted, and the Response does not refute, no Plaintiff claims to have experienced an enforcement action pursuant to any challenged policy—*i.e.*, "policies that … Universit[ies] adopted as directed by" the Act's Sections 1(b) and 2(a) on "Faculty member tenure and promotion considerations" and "[i]nstitutional review of tenured faculty members," respectively. [*Compare, e.g.*, ECF43 at 21, 25 (stating as much, and that Plaintiffs fail to show any challenged policy has been applied to them at all; cites omitted), *with generally* ECF44 (not disputing those points).]

Although the Response says that a few "complaints" were made (most of them by a "parent" or "anonymous" sources [ECF36-9 at 8]) against a Plaintiff last year "before Indiana University had implemented its formal reporting process" [ECF44 at 11-12 (citing a declaration, ECF36-9, that quotes I.C. § 21-39.5-2-4's requirement that Universities "establish … a procedure by which students and employees may submit complaints")], Plaintiffs undisputedly do not challenge any statute requiring adoption of a complaint policy or, in turn, any policy "adopted as directed by" such statute. [*Compare, e.g.*, ECF43 at 21 (noting absence of any such challenge to a complaint policy or to ECF36-8), *with generally* ECF44 (not addressing or disputing the point, and not citing ECF36-8), & *id.* at 4-6 (instead citing five other measures [ECF36-1, -2, -3, -6, -7]; "[t]hese are the policies that injury [Plaintiffs] today, and … are being challenged").]

Nor does the Response show present harm (including objectively reasonable chilling effect) or future harm (including credible threat of prosecution for intended activity) resulting from any challenged policy. [*See generally* ECF44.] Although the Response seems to focus on the standard for present harm and argues that the challenged policies have somehow factored into Plaintiffs' decisions to self-censor "today" [*e.g.*, *id.* at 6, 10, 12-13 & n.6], the Response continues to offer no real analysis

of any policies to trace any concrete, particularized, actual or imminent Article III harm to them. [*Compare, e.g.*, ECF43 at 13-14, 21-22 (noting lack of such analysis, including from Plaintiffs' briefing at ECF37, and that, *e.g.*, IU's policies ACA-33 and UA-08 [ECF36-4 & ECF36-5] do not reference any law at issue), *with generally* ECF44 (offering no significant further analysis of policies beyond the partial quotes from ECF37; not disputing the points just noted as to ACA-33 or UA-08, which the Response's justiciability section does not cite).].

Indeed, the Response's section purportedly about "the many ways in which [Plaintiffs] are being harmed by … the University policies" does not cite, much less show Article III harm from, any challenged policy.  [ECF44 at 8-13.]  Otherwise, and despite acknowledging policy "due process" protections, the Response conclusorily suggests that all of the challenged policies "provid[e] that the professors must 'comply with the requirements of IC 21-39.5-2-1" and that Plaintiffs have thus supposedly suffered "compelled and chilled speech" by undertaking self-censorship.  [*Id.* at 3, 9-10, 12-13 & nn.5-6; *accord id.* at 3, 10 (saying they "routinely present a variety of perspectives in their instruction" and "have always tried to implement" their conceptions of "free inquiry, free expression, and intellectual diversity," but personally "do not believe their past practices comply with the current … policies"; hinting, without citation, at worries of consequences for being "found … in violation" of unspecified "policies").]

This does not satisfy Article III as to the claims against University Defendants.  *See, e.g.*, *Carr I*, 2024 WL 3819424, at *5-6 (Plaintiffs "'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending'" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)); *id.* (they "must demonstrate that their fear is both actual and reasonable," not "merely 'imaginary or speculative'" (quoting *Brown*, 86 F.4th at 761 (quoting *Babbitt*, 442 U.S. at 298)))); *id.* (they must "have an 'objectively good reason for refraining

from speaking and self-censoring instead'" (quoting *Killeen*, 968 F.3d at 638 n.1)); *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (alleging "subjective chill" does not suffice (cleaned up)).

Nor does the Response acknowledge or address key policy language that University Defendants' opening Brief detailed. For example:

*IU's June 2024 "Faculty and Librarian Annual Reviews" policy*—As University Defendants explained, this policy requires that "[p]rocedures for implementing this policy shall be developed by each campus and each academic unit," and that those locally developed procedures not only "[c]omply with the requirements of IC 21-39.5" (*i.e.*, the sole phrase noted by the Response [ECF44 at 4]) but also "[p]reserve academic freedom." [ECF43 at 21-22 (citing ECF36-3 at 3, 5).] Yet the Response does not engage with such language or trace any Article III harm to it (or to any localized "[p]rocedures"), beyond an unsupported description of the policy as "explicitly" "providing that the professors must 'comply with the requirements of IC 21-39.5-2-1'" [ECF44 at 4, 8]. [*See also* ECF41-8 at 36 (McDonald Dep., 135:9-136:19) (saying, as quoted by ECF43 at 22 and not mentioned by the Response, "procedures used in annual reviews comply with" ACA-21's requirement that "academic freedom" be "preserve[d]").]

*IU's June 2024 "Faculty and Librarian Tenure" policy*—As University Defendants noted, this policy (from preliminary material cited by *Carr I*, 2024 WL 3819424, at *6 & n.6) provides not only that "[g]rants of tenure shall comply with the requirements of IC 21-39.5-2-1" (*i.e.*, the lone sentence noted by the Response [ECF44 at 4]), but also that "each unit of the University" has "the responsibility … to develop appropriate structures and administer the necessary procedures for the implementation of general University tenure policies," consistent with the University's recognition of "academic freedom" as "implicit in the principle of faculty and librarian tenure" at IU. [ECF43 at 22 (ECF36-1 at 2, 6).] Here too, the Response fails to address such language or to identify any Article

III harm resulting from it or from its referenced localized "structures" or "procedures" [*See generally* ECF44; *id.* at 4, 8].

*IU's June 2024 "Faculty and Librarian Promotions" policy*—As University Defendants explained, this provides not only that "faculty promotions must comply with the requirements of IC 21-39.5-2-1" (*i.e.*, the one sentence noted by the Response [ECF44 at 4]), but also that "[p]romotion considerations must take into account … differences in mission between campuses, and between schools and within campuses, as well as the individual's contribution to the school/campus mission," and referring to "campus-specific documents" "[f]or specific information on the promotion process." [ECF43 at 22 (citing ECF36-2 at 3-4).]  Again, the Response fails to address this text or to show any Article III harm from the policy as written (including as to any campus-specific process).  [*E.g.*, ECF44 at 4, 8].

*Purdue's December 2024 "Interim" standard on performance reviews*—This interim standard provides, *e.g.*, that "each department/school/division head/chair will develop a performance review process of all faculty in the head/chair's unit"; that "the final version of the unit policies" must be "approve[d]" by certain leadership; and that (in the only language cited by the Response [ECF44 at 5]) "[i]n accordance with Indiana law," the assessments "will include consideration of" whether the professor has "exposed students to scholarly works from a variety of political or ideological frameworks that may be within and applicable to the given academic discipline." [ECF43 at 22 (citing ECF36-7 at 1, 4-5).]  Here again, the Response remains unable to identify any particularized Article III harm flowing from the full, interim text (or from any such locally developed "performance review process").  [*See generally* ECF44.]

*Purdue's July 2024 interim standard on intellectual diversity*—The Response fares no better as to this interim measure, which was within the "preliminary" material cited by *Carr I, at *6 n.6.* Despite arguing that the it "violate[s] [Plaintiffs'] right to academic freedom" [ECF44 at 22], the

Response neither mentions nor engages with the standard's following language—quoted by University Defendants [ECF43 at 22 (citing ECF36-6 at 2)]—regarding academic and other freedoms: "Notwithstanding the foregoing, determinations made with respect to the criteria described in this standard will take into account the appropriate exercise of academic freedom and in any event may not consider any of the following actions by a faculty member: (1) expressing dissent or engaging in research or public commentary on subjects; (2) criticizing the institution's leadership; or (3) engaging in any political activity conducted outside the faculty member's teaching duties at the University."

Unable to identify any particularized Article III harm flowing from this interim standard's full text, the Response quotes only the standard's initial portion that is expressly subject to the unaddressed language noted above and in University Defendants' opening Brief.  [ECF44 at 5 ("[a]s a public institution in the state of Indiana," the University "endeavors to foster a culture of free inquiry, free expression and intellectual diversity," and "to employ faculty, lecturers and teaching assistants who expose students to scholarly works from a variety of political or ideological frameworks within and applicable to the given academic discipline while refraining from subjecting students to views and opinions concerning matters not related to the discipline or assigned course of instruction"; "[f]aculty being reviewed for tenure and/or promotion are evaluated on criteria meant to assess their likeliness to contribute to the above goals in addition to the criteria outlined in the policy," not challenged by the Response, "on Academic Tenure and Promotion (I.B.2)"; "[f]aculty members awarded tenure are evaluated at least every five years thereafter on the same criteria" (quoting ECF36-6 at 1-2)).]

Any notion that Article III harm flows from the mere "exist[ence]" [ECF44 at 5-6] of the challenged policies fares no better.  Per University Defendants' cited, unaddressed authority, the "chilling effect" of something "potentially unconstitutional … being on the books is insufficient to justify federal intervention' in a pre-enforcement suit," even where it "is said to chill ... freedom of speech ...." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 (2021) (cleaned up) (cited by ECF43 at

17). Speculation that policy language might be "misapplied," such as by disregarding key portions, cannot suffice either. *Schirmer v. Nagode*, 621 F.3d 581, 583 (7th Cir. 2010).

At bottom, Plaintiffs remain unable to show Article III injury traceable to the challenged policies and likely to be redressed by enjoining their enforcement.

      3.  <u>Claims against University Defendants remain unripe.</u>

For reasons noted above, the premature nature of the claims against University Defendants also makes them unripe. As in *Carr I*: "Nothing changes if [one] assess[es] [the] complaint through the lens of ripeness" (*Carr I*, 2024 WL 3819424, at *7 (quoting *Sweeney v. Raoul*, 990 F.3d 555 at 561 (7th Cir. 2021)). That doctrine requires that the case stand independent of "contingent future events that may not occur … at all" or "as anticipated" (*Trump*, 592 U.S. at 131 (cite omitted)), and "avoid[s] the premature adjudication of cases when the issues posed are not fully formed, or when the nature and extent of the statute's application are not certain" (*Carr I*, 2024 WL 3819424, at *7 (quoting *Triple G Landfills, Inc. v. Fountain Cnty. Bd. of Comm'rs of Fountain Cnty., Ind.*, 977 F.2d 287, 288-89 (7th Cir. 1992) (cites omitted))).

"Here," as in *Carr I*, "contingencies abound," and the developments in policymaking and enforcement that Plaintiffs envision "may not occur at all" or "as anticipated." 2024 WL 3819424, at *7 (quoting *Trump*, 592 U.S. at 131). Again, per facts detailed in University Defendants' first Brief [ECF43 at 14-15, 18-21 & nn.3-6] and recapped non-exhaustively above at § 2(B)(1), policymaking and implementation remain preliminary and subject to change. The Response does not engage with or dispute those facts. [*See generally* ECF44.] Nor can it materially distinguish them from the facts that required dismissal of unripe, non-justiciable claims in *Carr I*. Here, as there, "predictions" and "conjecture … fall short of" a "justiciable Case or Controversy" against University Defendants. *Carr I*, 2024 WL 3819424, at *7 (quoting *Trump*, 592 U.S. at 131 (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983))).

### III.    Conclusion

This Court should dismiss the claims against the University Defendants, Trustees of Indiana University and Trustees of Purdue University, for lack of subject-matter jurisdiction.

Respectfully submitted,

/s/ John R. Maley
John R. Maley
Dylan A. Pittman
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: (317) 231-7464
Email:  jmaley@btlaw.com
        dpittman@btlaw.com

*Counsel for Defendants*
*Trustees of Indiana University, and*
*Trustees of Purdue University*