UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| STEVEN ALAN CARR, <br> DAVID G. SCHUSTER, <br> JAMES SCHEURICH, and <br> DAVID MCDONALD, <br><br> Plaintiffs, <br><br> v. <br><br> TRUSTEES OF PURDUE UNIVERSITY, <br> in their official capacities; <br> TRUSTEES OF INDIANA UNIVERSITY, <br> in their official capacities, <br><br> Defendants. <br><br> STATE OF INDIANA, <br><br> Intervenor. | No. 1:24-cv-1575-RLY-CSW |

**ENTRY ON THE UNIVERSITY DEFENDANTS' and the INTERVENOR STATE OF INDIANA'S MOTIONS TO DISMISS and PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Steven A. Carr, David G. Schuster, James Scheurich, and David McDonald are tenured professors at Purdue University and Indiana University. They bring this action against Defendants Trustees of Purdue University and Trustees of Indiana University ("University Defendants") to enjoin enforcement of Senate Enrolled Act 202, which requires the trustees of public universities to promulgate and implement policies regarding faculty members' tenure and promotions, on grounds that it violates the First and Fourteenth Amendments to the United States Constitution. The University

1

Defendants and Intervenor-Defendant State of Indiana (collectively "Defendants") have moved to dismiss this suit for lack of subject matter jurisdiction. For the reasons explained below, Defendants' Motions to Dismiss are **GRANTED** and Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

## I.   Background

### A.   SEA 202

Effective July 1, 2024, Senate Enrolled Act 202 ("SEA 202" or the "Act") amends the Indiana Code relating to higher education by creating Article 39.5, codified at Indiana Code § 21-39.5 *et seq.*, entitled "State Educational Institutions: The Protection of Free Inquiry, Free Expression, and Intellectual Diversity." The statutory prohibitions and requirements imposed by this article apply to state higher educational institutions (referred to in the Act as "institutions"), including the Universities and their Boards of Trustees. Ind. Code § 21-39.5-1.

Two sections of the Act are at issue—Indiana Code §§ 21-39.5-2-1(b) ("Section 1(b)") & 21-39.5-2-2(a)(1)–(2) ("Section 2(a)"). Section 1(b) provides, in relevant part:

> [E]ach board of trustees of an institution shall establish a policy that provides that a faculty member may not be granted tenure or a promotion by the institution if, based on past performance or other determination by the board of trustees, the faculty member is:
>
> (1) unlikely to foster a culture of free inquiry, free expression, and intellectual diversity within the institution; [or]
>
> (2) unlikely to expose students to scholarly works from a variety of political or ideological frameworks that may exist within and are applicable to the faculty member's academic discipline.

Ind. Code § 21-39.5-2-1(b)(1)–(2).  SEA 202 does not define the statutory terms "free inquiry" and "free expression," but it does define "intellectual diversity" as "multiple, divergent, and varied scholarly perspectives on an extensive range of public policy issues."  Ind. Code § 21-39.5-1-5.

> Section 2(a) further provides, in relevant part:
>
> Not later than five (5) years after the date that a faculty member is granted tenure by an institution and not later than every five (5) years thereafter, the board of trustees of an institution shall review and determine whether the faculty member has met the following criteria:
>
> > (1) Helped the institution foster a culture of free inquiry, free expression, and intellectual diversity within the institution.
> >
> > (2) Introduced students to scholarly works from a variety of political or ideological frameworks that may exist within the curricula established by the:
> >
> > > (A) board of trustees of the institution under IC 21-41-2-1(b); or
> > >
> > > (B) faculty of the institution acting under authority delegated by the board of trustees of the institution.

*Id*. § 21-39.5-2-2(a)(1)–(2).

In determining whether a faculty member has satisfied the criteria set forth in Section 2(a), boards of trustees may not consider certain activities of a faculty member, including "(1) [e]xpressing dissent or engaging in research or public commentary on subjects"; "(2) [c]riticizing the institution's leadership"; and "(3) [e]ngaging in any political activity conducted outside the faculty member's teaching duties at the institution."  *Id.* § 21-39.5-2-2(c)(1)–(3).  Furthermore, "[n]othing in [Article 39.5] may be construed to . . . [l]imit or restrict the academic freedom of faculty members or prevent

3

faculty members from teaching, researching, or writing publications about diversity, equity, and inclusion or other topics." *Id.* § 21-39.5-6-1(3).

Each institution is required to "adopt a policy that establishes disciplinary actions . . . that the institution will take if the board of trustees determines that a faculty member has failed to meet one (1) or more of the criteria described in" Section 2(a). *Id.* § 21-39.5-2-2(d). Such disciplinary actions include: "(1) termination; (2) demotion; (3) salary reduction; (4) other disciplinary action as determined by the institution; or (5) any combination of subdivisions (1) through (4)." *Id.*

Lastly, each institution is required to establish and communicate a procedure by which both students and employees may submit complaints that any faculty member "is not meeting the criteria described in section 2(a)(1) through 2(a)(5) of this chapter." *Id.* § 21-39.5-2-4(a)(1), (2). If any complaints are received, the Act requires the institution to refer them to "appropriate human resource professionals and supervisors for consideration in employee reviews and tenure and promotion decisions." *Id.* § 21-39.5-2-4(a)(3).

**B.    Plaintiffs**

**1.    Professor David McDonald**

David McDonald has been employed as an associate professor in the Department of Folklore and Ethnomusicality at Indiana University Bloomington since 2008. (Filing No. 36-9, McDonald Decl. ¶¶ 2, 4). He was awarded tenure in 2014 and has served two terms as Chair of his department. (*Id.* ¶¶ 3, 5). He plans to seek promotion as a full professor in 2025. (*Id.* ¶ 5).

4

Professor McDonald's research and courses focus on the ethnomusicology of violence, war, and social movements, with a special focus and expertise on issues related to Israel and Palestine and the Israeli-Palestinian conflict. (*Id.* ¶¶ 7, 22).

### 2.  Professor James Scheurich

James Scheurich has been employed as a tenured Chancellor's Professor in the School of Education at Indiana University Indianapolis since 2012. (Filing No. 36-10, Scheurich Decl. ¶¶ 2–4). He is also the Coordinator of the Urban Education Studies program, where he oversees the program's more than 70 doctoral students. (*Id.* ¶ 7).

Professor Scheurich's research and courses focus on issues relating to race, class, gender, sexuality, and disabilities in the educational system and society. (*Id.* ¶ 8).

### 3.  Professor Steven Alan Carr

Steven Alan Carr is employed as a Professor of Communication and the Graduate Program Director of the Department of Communication at Purdue University Fort Wayne (or "PFW"). (Filing No. 36-11, Carr Decl. ¶ 2). He also serves as the Director of the Institute for Holocaust and Genocide Studies at PFW. (*Id.* ¶ 6). He has been employed by PFW since 1994 and was awarded tenure in 2000. (*Id.* ¶¶ 3–4). He was promoted to full professorship in 2016. (*Id.* ¶ 4).

As a professor in the Communication Department, Professor Carr teaches courses in media and cultural studies. (*Id.* ¶ 7). As the Graduate Program Director of his department, Professor Carr advises approximately 20 graduate students on everything from admission to the completion of their final degree requirements. (*Id.* ¶ 8). As the Director of the Institute for Holocaust and Genocide Studies, he supports and promotes

teaching and research about the Holocaust and other genocides and promotes public engagement in global genocide prevention efforts. (*Id.* ¶ 9).

### 4. Professor David F. Schuster

David Schuster is an associate professor in Purdue University Fort Wayne's Department of History. (Filing No. 36-12, Schuster Decl. ¶ 2). He has been employed by PFW since 2006 and was awarded tenure in 2012. (*Id.* ¶¶ 3–4). He intends to stay at PFW and to seek a promotion to full professorship in the next several years. (*Id.* ¶¶ 4–5).

Professor Schuster teaches courses in U.S. history, including the "culture wars" surrounding the LGBTQ rights movement in the 1990s and slavery and its legacy. (*Id.* ¶¶ 6, 20–21).

## C. The Universities' Policies

### 1. Indiana University's Policies

Indiana University has taken preliminary measures to comply with the requirements of the Act, effective June 14, 2024. Policy ACA-37, entitled "Faculty and Librarian Tenure," was amended to include the following requirement: "Grants of tenure shall comply with the requirements of IC 21-39.5-2-1." (Filing No. 36-1, Faculty and Librarian Tenure at ECF p. 7). Policy ACA-38, "Faculty and Librarian Promotions," was amended to include this provision: "All faculty promotions must comply with the requirements of IC 21-39.5-2-1." (Filing No. 36-2, Faculty and Librarian Promotions at ECF p. 4). And ACA-21, "Faculty and Librarian Annual Reviews," was amended to add that the procedures used in annual reviews shall "[c]omply with the requirements of IC 21-39.5." (Filing No. 36-3, Faculty and Librarian Annual Reviews at ECF p. 3).

Professor McDonald characterized these changes as a "stop-gap measure until [the university] had the time to have faculty . . . do the kind of work necessary to revise the policies in such a manner that remained compliant with the law but also reflected . . . the values of the institution." (Filing No. 41-8, 1/31/25 McDonald Dep. at 54–55).

Professor McDonald "understands" that Indiana University also amended its complaint process, managed university-wide through a platform called "EthicsPoint," to include complaints of a faculty member's failure to comply with the criteria set forth in the Sections (1)(b) and (2)(a)(1)–(2) of the Act. (McDonald Decl. ¶ 19). It is not clear from his declaration (which is undated) when this complaint process was instituted.

### 2. Purdue University

Purdue also enacted interim policies required by the Act. Standard S-27, entitled "Intellectual Diversity, Interim" became effective on July 1, 2024. It provides:

> As a public institution in the state of Indiana, Purdue University endeavors to foster a culture of free inquiry, free expression and intellectual diversity. The University also endeavors to employ faculty, lecturers and teaching assistants who expose students to scholarly works from a variety of political or ideological frameworks within and applicable to the given academic discipline while refraining from subjecting students to views and opinions concerning matters not related to the discipline or assigned course of instruction.
>
> Faculty being reviewed for tenure and/or promotion are evaluated on criteria meant to assess their likeliness to contribute to the above goals in addition to the criteria outlined in the policy on **Academic Tenure and Promotion (I.B.2)**. Faculty members awarded tenure are evaluated at least every five years thereafter on the same criteria. For non-tenured faculty and other employees and individuals assigned teaching responsibilities, the University considers the individual's contributions to the above stated goals as part of the performance review process, prior to renewing employment agreements, and prior to awarding any bonuses. Failure to meet the established criteria

may result in appropriate disciplinary action up to and including termination of employment.

(Filing No. 36-6, Intellectual Diversity, Interim at 1–2) (formatting in original).

Standard S-4, "Performance Reviews for Tenured, Tenure-Track, Clinical/Professional and Research Faculty, Interim," last revised December 2, 2024, provides that "each department/school/division head/chair will develop a performance review process of all faculty in the head/chair's unit." (Filing No. 36-7, Performance Reviews for Tenured, Tenure-Track, Clinical/Professional and Research Faculty, Interim at ECF p. 4). "In accordance with Indiana law," annual assessments "will include consideration of" whether the professor has "exposed students to scholarly works from a variety of political or ideological frameworks that may be within and applicable to the given academic discipline." (*Id.*).

Finally, in a document entitled "Operating Procedures for Complaints Related to Intellectual Diversity," Purdue describes how students, faculty, and staff may file a complaint based on, for example, a faculty member's failure to "[f]oster[] a culture of free inquiry, free expression, and intellectual diversity." (Filing No. 36-8, Operating Procedures for Complaints Related to Intellectual Diversity at ECF p. 1).

### D. Changes in the Classroom

Plaintiffs testified that they do not know what it means to "foster a culture of free inquiry, free expression, and intellectual diversity within the institution." (McDonald Decl. ¶ 20; Scheurich Decl. ¶ 21; Carr Decl. ¶ 22; Schuster Decl. ¶ 18). In their efforts to comply with the Act and their institutions' implementing policies, they testified that they

8

have altered the content and pedagogy of their courses. (McDonald Decl. ¶ 33; Scheurich Decl. ¶¶ 33–34; Carr Decl. ¶ 35; Schuster Decl. ¶ 31).

For example, Professor McDonald has "drastically" changed the number and types of readings and other required course materials used to teach about the history and culture of Palestine. (McDonald Decl. ¶ 33). He has also eliminated in-class discussion of political topics and themes, focusing instead on class lectures. (*Id.* ¶ 34). Professor Scheurich feels constricted in what he is comfortable saying in his classes, even if his statements are supported by social science literature, for fear someone will complain that he is not fulfilling the mandates of "intellectual diversity." (Scheurich Decl. ¶ 35). Professor Carr cut back on assigned readings in his 2024 fall semester graduate class to focus more on the mechanics of writing and less on substantive content. (Carr Decl. ¶ 36). He also omitted assigned readings that a student could potentially view or challenge as one-sided. (*Id.*). And in his spring classes, he omitted clips of films that he otherwise would have shown, such as *Lawrence of Arabia* (1962), due to its depictions of Arabs and Arab culture. (*Id.* ¶ 37). Professor Schuster no longer begins his classes with current event discussions with his students because he believes if a student feels unheard, dismissed, or targeted because of their viewpoint, he may be held responsible for failing to create a culture of free inquiry, free expression, and intellectual diversity. (Schuster Decl. ¶ 33). He also refrains from giving his personal opinion on controversial issues (such as whether the United States was justified in dropping the atomic bomb on Japan during World War II) that are the subject of his courses, even if asked to give one by a student. (*Id.* ¶ 35).

9

### E. Prior Litigation

On May 7, 2024, Plaintiffs first sued the University Defendants before the Act took effect on July 1, 2024, and before the Universities had established any policies, alleging Section 1(b)(1) & (2) and Section 2(a)(1) & (2) of the Act are unconstitutional because they "impinge upon the plaintiffs' academic freedom" and are "impermissibly vague." (*Carr v. Trs. of Purdue Univ.*, No. 1:24-cv-772-SEB-MJD (S.D. Ind.), Filing No. 19, Am. Compl. ¶¶ 69–70). Plaintiffs filed their Motion for Preliminary Injunction on July 8, 2024, and the State of Indiana intervened as of right to defend the Act's constitutionality.

On August 14, 2024, the court granted the University Defendants' and the State's Motions to Dismiss without prejudice, finding "no standing or ripeness regarding Plaintiffs' claims." *Carr v. Trs. of Purdue Univ.*, No. 1:24-cv-772-SEB-MJB, 2024 WL 3819424, at *5 (S.D. Ind. Aug. 14, 2024). Having made that ruling, the court denied Plaintiffs' Motion for Preliminary Injunction. *Id.* at *7.

### F. This Lawsuit

Plaintiffs filed the present lawsuit four weeks later, alleging the same claims against the same parties.[1] Plaintiffs allege that "Indiana Code §§ 21-39.5- 2-1(b)(1), (2) and Indiana Code §§ 21-39.5-2-2(a)(1), (2) and the policies that the Universit[ies] adopted as directed by these statutes, violate the First Amendment to the extent they

---

[1] Plaintiff filed two separate but parallel complaints—one against the Trustees of Indiana University (1:25-cv-1575) and the other against the Trustees of Purdue University (1:24-cv-00578). These cases were consolidated on October 28, 2024. (*See* Filing No. 23, Order).

10

infringe the plaintiffs' academic freedom" and "violate the First Amendment and the Due Process Clause of the Fourteenth Amendment in that they are impermissibly vague." (Filing No. 1, Compl. ¶¶ 70–71).

Plaintiffs have filed a motion for a preliminary injunction, asking the court to enjoin Section (b)(1) & (2) and Section 2(a)(1) & (2) of the Act, as well as "defendants' policies." (Compl., Request for Relief ¶ c). The University Defendants and the State oppose Plaintiff's motion and move to dismiss their claims on grounds that Plaintiffs have not satisfied Article III's standing and ripeness jurisdictional requirements.

Before addressing whether Plaintiffs are entitled to a preliminary injunction, the court must first consider the threshold question of jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (holding the court must resolve jurisdictional issues before merits issues).

**II.    Legal Standard**

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. The court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the plaintiff. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588 (7th Cir. 2014). Where, as here, the defendant raises a factual challenge to jurisdiction, the court may "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue." *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). The plaintiff bears the burden of establishing that all jurisdictional requirements have been met. *Burwell*, 770 F.3d at 588.

### III.  Discussion

Article III of the Constitution limits the federal courts' subject matter jurisdiction to resolving actual "Cases" and "Controversies." *Nabozny v. Optio Sols., LLC*, 84 F.4th 731, 733 (7th Cir. 2023) (citing U.S. Const. art. III, § 2).  This limitation "requires a claim that is ripe and a plaintiff who has standing." *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007).  These concepts are related yet distinct: "Whereas ripeness is concerned with *when* an action may be brought, standing focuses on *who* may bring a ripe action." *Id.* (quoting *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 n.1 (3d Cir. 1996)).

#### A.  Standing

To establish Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "Standing must exist at the time the lawsuit is filed." *Patterson v. Howe*, 96 F.4th 992, 1000 (7th Cir. 2024).  The plaintiff bears the burden of establishing the elements of standing. *Spokeo*, 578 U.S. at 338.

This case primarily concerns the first element, which requires the plaintiff's injury be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (cleaned up) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Where a plaintiff brings a pre-enforcement facial challenge under the First Amendment, a "plaintiff[] must make one of two showings to establish an injury in fact." *Speech First, Inc. v. Killeen*, 968 F.3d

628, 638 (7th Cir. 2020) (citing *Susan B. Anthony List*, 573 U.S. at 158–59). "First, a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does." *Id.* "Second, a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.* Like the first showing, a plaintiff proceeding under the second showing must also show a credible threat of enforcement. *Id.* at 639 n.1 ("Either [under the first or second showing], a credible threat of enforcement is critical; without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead.'") (quoting *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)).

Self-censorship of protected speech may qualify as an Article III injury, provided the plaintiffs have "an 'actual and well-founded fear' that the law will be enforced against them." *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)). "[T]o ensure that the risk of prosecution is 'credible,' plaintiffs must demonstrate that their fear is both actual and reasonable, not 'imaginary or speculative.'" *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

Here, Plaintiffs argue they have engaged in acts of self-censorship "in an attempt to comply with the challenged policies and the Act." (Filing No. 44, Pl.'s Resp. at 9). These acts of self-censorship are detailed in Section I.D. of this opinion. To summarize, they have "changed the content and pedagogy of their courses," "altered and continue to alter the readings they assign and discuss," and "have modified and continue to modify

13

the format of their courses." (*Id.*). The court finds Plaintiffs have adequately shown they have an actual fear of enforcement that has chilled their protected speech. The issue is whether that fear is well-founded.

Plaintiffs' fear that the Act will be enforced against them is not well-founded. Section 1(a) of the Act "applies to . . . *institution[s]*" and requires their boards of trustees to "establish a policy that provides that a faculty member may not be granted tenure or a promotion" if certain criteria are not met. Ind. Code § 21-39.5-2-1(a)–(b)(2) (emphasis added). Section 2 provides that "the board of trustees. . . shall review and determine whether the faculty member has met" the criteria set forth in the statute. *Id.* § 21-39.5-2-2(a). Therefore, as the court previously held in *Carr*, by its terms, the Act governs the Trustees of the Universities, not individual faculty members like Plaintiffs. *Carr*, 2024 WL 3819424, at *6.

Even if the Act applied to Plaintiffs, the "chilling effect . . . of a potentially unconstitutional law being on the books is insufficient to justify federal intervention in a pre-enforcement suit." *Whole Women's Health v. Jackson*, 595 U.S. 30, 50 (2021) (cleaned up). This is so "whether the challenged law in question is said to chill . . . the freedom of speech, . . . or any other right." *Id.* Speculation that policy language might be "misapplied," such as by disregarding key portions, cannot suffice either. *Schirmer v. Nagode*, 621 F.3d 581, 583 (7th Cir. 2010).

Plaintiffs' fear that the Universities' implementing policies will be enforced against them is not well-founded either. At the time this lawsuit was filed on September 13, 2024, those policies were nothing more than preliminary and interim measures, with

14

policymaking and implementation still ongoing.  For example:

- Professor McDonald, who serves on the Bloomington Faculty Council or "BFC,"[2] testified that to his knowledge, no SEA 202-related policy has been officially enacted.  (Filing No. 41-13, 6/12/24 McDonald Dep. at 123).  University policy is "still undergoing revision and change in committee, and . . . eventually it will be brought to the full BFC for vote." (*Id.*).  Once it has been approved by vote and made university policy, "that policy will then be carried to the units, the schools and Colleges, and to individual departments to modify their various documents such that they remain in compliance."  (*Id.*; *see also* 1/31/25 McDonald Dep. at 56 (explaining "first we have a campus policy, before we can have a College policy, before we can have a department policy, before we can have a faculty member actually implement those policies")).  "So it takes a lot of time."  (1/31/25 McDonald Dep. at 56).

- Professor Carr reports that at Purdue University Fort Wayne, implementation of SEA 202, as well as policymaking and development of guidance, is "an ongoing process," with "interim" university-wide measures "subject to potential revision." (Carr Dep. at 48–49).  His department—the Department of Communication—has not "enacted or formalized any policies or procedures concerning 202."  (*Id.* at 49).  Professor Schuster has a similar understanding of SEA 202's implementation

---

[2] The BFC is the faculty representative board that "consult[s] with university administrators on the formation of policy and the implementation and compliance" with such policy. (McDonald Dep. at 32–33).

at Purdue. (Schuster Dep. at 81 (noting that "at Purdue, SEA 202 implementation is an ongoing process," with "Purdue ha[ving] issued interim measures" that are "subject to revision")).

As the court observed in *Carr*:

> Plaintiffs have not addressed whether (or how) the [Universities'] interim policies arguably enhance their First Amendment concerns or otherwise heighten the threat of harm to them. Absent the formulation and enforcement of these final policies, it is impossible to determine whether Plaintiffs do in fact have an "objectively good reason for refraining from speaking and self-censoring instead."

*Carr*, 2024 WL 3819424, at *6 (quoting *Speech First*, 968 F.3d at 638 n.1).

The court understands that on August 25, 2024, Professor McDonald received four complaints (one student, one parent, and two anonymous) after he participated in a faculty panel on "Politics, Thought, Voice" sponsored by the Intensive First Year ("IFS") Seminar at Indiana University. (McDonald Decl. ¶ 32). These complaints asserted that his talk on the war in Gaza, which ended with a short video clip of protest chants on campus, contained an "Anti-Israel" message. (*Id.*). Professor McDonald provided a copy of his remarks and the video clip to the IFS Director. (*Id.*; 1/31/25 McDonald Dep. at 79; Filing No. 41-6, McDonald Email at ECF p. 2). "From that point, it was [his] understanding that [the IFS Director] and several other folks in the College determined that the complaints were without merit. And the matter was dropped." (McDonald Email at ECF p. 2).

This incident does not reflect a credible threat that Indiana University's interim SEA-related policies will be used against Professor McDonald or any other Plaintiff. As

16

Professor McDonald admits, these complaints were made before the university had "established its online portal for accepting complaints regarding SEA 202," and thus, were not made under Indiana University's policies. (McDonald Decl. ¶ 43; 1/31/25 McDonald Dep. at 74; Filing No. 41-6, McDonald Email at ECF p. 2). But even if the complaints were submitted through Indiana University's SEA 202 complaint process, Professor McDonald was *not* subjected to any discipline or threatened discipline from Indiana University based on his August 25 speech.

After this case was filed, Professor Scheurich reported that Indiana University Indianapolis passed three policies consistent with SEA 202 on January 14, 2025. (Scheurich Dep. at 24–26, 40, 85). Professor Scheurich's testimony suggests that more SEA 202 policies are on the horizon. (*Id.* at 40 ("Q: [Y]ou don't believe the five-year post-tenure review is reflected in these three policies that the IFC passed in January? A: I don't think so. . . . Q: So would you be willing to say that the process of implementation is still ongoing[?] A: Oh, yeah, yeah."); *see also id.* at 44–45 ("Q: "[W]ould you say that it would take a while for all of these different units to implement SEA 202 specifically? A: I don't know if I would say that or not because we have been struggling with it, you know?")). These policies are not in evidence nor mentioned or challenged in Plaintiffs' Response. In addition, Purdue's Intellectual Diversity policy became effective as of June 1, 2025.[3] (*See* Filing No. 49-1, Intellectual Diversity Policy).

---

[3] The amended policy's terms are substantially the same as the "interim" policy. (Filing No. 49-2 (indicating revisions using Microsoft Word's "compare documents" tool)).

17

Even if the court could consider these policies for purposes of standing, they do not bolster Plaintiffs' case. First, Plaintiffs offer no analysis of the policies—even the interim policies—and explain how the *terms of those policies* have chilled their speech. Second, they provide no evidence of any imminent enforcement of the policies against them, forcing them to self-censor. They do not claim that the Universities have instructed them to change their syllabi or pedagogies or that the Universities have received any complaints against them since these policies took effect. In short, no action or threatened action has been taken against Plaintiffs based on any university SEA 202-related policy. Plaintiffs' acts of self-censorship, without more, do not satisfy Article III as to the claims against the University Defendants. *See, e.g.*, *Carr*, 2024 WL 3819424, at *5-6 (Plaintiffs "'cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.'" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013))).

### B. Ripeness

The doctrine of ripeness "seeks to avoid the premature adjudication of cases when the issues posed are not fully formed, or when the nature and extent of the statute's application are not certain." *Triple G Landfills, Inc. v. Bd. of Comm'rs of Fountain Cnty.*, 977 F.2d 287, 288–89 (7th Cir. 1992). A claim is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).

Plaintiffs' case is not ripe for the same reasons Plaintiffs lack standing. *See Commonwealth Edison Co. v. Train*, 649 F.2d 481, 483–84 (7th Cir. 1980) (noting that in

some cases, "the concepts of standing and ripeness merge . . . , [as] [b]oth concepts recognize that, for both constitutional and prudential reasons, the courts should not attempt to decide cases that do not reflect a current controversy between the parties"). At this juncture, the policies remain largely interim and subject to change, there have been no complaints filed by students or employees against Plaintiffs or any other faculty member pursuant to § 21-39.5-2-4 of the Act, and there has been no enforcement action or threatened enforcement action against Plaintiffs or any other faculty member by either Purdue or Indiana University pursuant to any SEA 202-related policy. Accordingly, Plaintiffs' case must be dismissed for lack of jurisdiction.

### III. Conclusion

For the reasons explained above, Intervenor State of Indiana's Motion to Dismiss for Lack of Subject Matter Jurisdiction (Filing No. 40) is **GRANTED**, the University Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Filing No. 42) is **GRANTED**, and Plaintiffs' Motion for Preliminary Injunction (Filing No. 12) is **DENIED**.

**IT IS SO ORDERED** this 23rd day of July 2025.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.